IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JARVELL DEANDRE SMART,                        No. CIV S-08-0739-WBS-CMK-P

        Petitioner,

   vs.                                                   FINDINGS AND RECOMMENDATIONS

ANTHONY HEDGPETH, et al.,

        Respondents.

_____/

        Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pending before the court are petitioner's petition for a writ of habeas corpus (Doc. 1), respondents' answer (Doc. 23), and petitioner's reply (Doc. 31).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

# I. BACKGROUND

A.   **Facts**[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> About 8:00 p.m. on March 29, 2004, Sabrina Norman and her brother Roy Rayford were fired upon after just entering Norman's white Ford Explorer in the parking lot of the Franklin Villa apartment complex at the G Parkway in Sacramento.  Norman explained that she had just moved into a new apartment at the complex next to a friend of hers.  The friend's husband, Mtula Payton, known as Big T.C. Deuce, was a member of the Garden Block Crips gang.  Payton and another Crip called Capone drove vehicles similar to Norman's Explorer.
>
> After just entering the Explorer, Norman, sitting in the driver's seat, heard a gunshot come from her right side (i.e., the passenger side).  Rayford initially said he could not tell the shot's origin, but later stated he thought it came from the driver's side (i.e., the left side) and that it sounded like a nine-millimeter handgun.  Norman saw two young men – the taller of the two holding in his right hand a black handgun, pointed downward – standing approximately seven feet from the rolled-down front passenger window of the vehicle.  The shorter man did not have a gun.
>
> Norman and Rayford ducked as gunfire erupted on both sides of the vehicle.  Norman was hit on her right cheek.  The driver's side window shattered and Rayford suffered a bullet wound behind his left ear.  The firing continued.  Norman was then hit a second time, this time by a shotgun in the upper left arm.
>
> Norman estimated that at least 10 shots were fired over a period of 30 to 40 seconds.  She believed she was in a cross fire.
>
> At one point during the barrage, Norman observed the same two young men walk in front of her car.  The taller one asked the other, "[D]id you get 'em?"
>
> Frightened and scrunched down, Norman put the Explorer in reverse.  With Rayford's help, she backed out.  More firing ensued.  Norman drove the car to the complex's security booth and Rayford had the security guard call 911.
>
> Norman suffered a three-to-four centimeter gunshot laceration to her right cheek, which caused a scar, and multiple puncture wounds from shotgun pellets, which uncomfortably remain in an eight-inch area of her left arm.  Rayford incurred a bullet wound to the left side of his head, which fractured his jaw.

---

[1]      Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct."  Petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  See id.  These facts are, therefore, drawn from the state court's opinion(s), lodged in this court.  Petitioner may also be referred to as "defendant."

There is some dispute whether Norman told an investigating officer that the two young men she observed – both Black males – were in their mid-20's, or whether she said one looked about 20 and the other 17.

Within days of the shooting, Norman was shown photo lineups that included photos of Calhoun and Smart. Norman did not identify either defendant from the photos, but indicated that one of the photos resembled Calhoun. Norman also reiterated to an officer that she had been caught in a cross fire.

At trial, Norman identified Calhoun and Smart as the two young men she had observed at the shooting, with Calhoun being the taller individual with the gun. At the scene of the shooting, Norman had seen the taller man, who was around 5 feet 11 inches tall, in her headlights, but the shorter man, who was around 5 feet 8 inches tall, was further back. Norman had told a responding officer that she could probably identify the taller suspect but not the shorter one. Rayford made no identifications in photo lineups or in court.

Carlos Haggerty witnessed the incident from about two blocks away. Haggerty corroborated much of Norman's account of the firing, adding that he saw a man run after Norman's moving car, shooting at it. Haggerty believed that at least two guns were used because he heard "a whole bunch of gunfire."

Another witness, Jezmier Slade, was alerted after hearing six to eight rapid gunshots. Slade saw two Black men, one significantly taller than the other, standing beside the driver's door of a white Ford Explorer. The vehicle drove off and the men ran off. As the men ran, Slade saw the taller one holding what Slade thought was a semiautomatic handgun in his left hand. Smart had Slade recalled to testify that one man was about six inches taller and perhaps 40-50 pounds heavier than the other.

Calhoun claimed he was 5 feet 10 inches tall and weighed 143 pounds at the time of the offenses; Smart's comparables were 5 feet 9 inches and 146 pounds. At trial, the two stood next to each other. Smart looked a little shorter.

The day after the shooting, the police investigated at the G Parkway. They arrested 14-year-old Melvin Reno, who claimed to be a Garden Block (29th Street) Crip gang member along with Smart and Calhoun. Reno was on probation for robbery and attempted burglary and wanted to know "what he could get" for talking to the police about the shooting.

According to Reno, on the Saturday before the shooting, Big T.C. Deuce (Mtula Payton) had punched out a Meadowview Blood at a party in the G Parkway.

Testifying at trial in exchange for his relocation, Reno testified that, on the night of the shooting, he was simply walking through the G Parkway when he saw Calhoun, Smart, and a Blood named Jacoby James, who was known as "Sir." James fired first at a white Explorer or at Calhoun and Smart, and Calhoun returned fire with a handgun while Smart accompanied Calhoun. Reno speculated that James fired at the vehicle or at Calhoun and Smart in retaliation for the assault on the Blood the previous Saturday (some Crips had similar vehicles), or that Calhoun fired at the vehicle because Sabrina Norman had a son who was a Blood.

The police tried but could not find Jacoby James, but they conceded he had been arrested on an unrelated matter.

Police also interviewed 15-year-old Eugene Gibson, who is Calhoun's nephew.  Initially, Gibson denied being at the G Parkway on the night of the shooting.  Then he admitted that he and Calhoun were there, and that Calhoun returned fire from apparently some Meadowview Bloods.  When the police pressed Gibson about Smart, Gibson stated that Smart was there as well.  Gibson added that he did not see a gun in Smart's hands but thought Calhoun and Smart both shot two times, and that Calhoun was firing a handgun that "spits" out shells (no such shell was found at the scene).

Testifying at trial under a grant of immunity, Gibson stated that everything he had told the police before trial was untrue.

The police interviewed both Smart and Calhoun after their arrests.  The prosecutor played both tape-recorded interviews for the jury.

Initially, and for hours, Smart denied being present at the shooting.  He admitted being a Garden Block Crip (24th Street) gang member (the Garden Block Crips consist of the 29th, 24th, and 21st Street subsets).  In a later interview, Smart conceded he was on the scene, but claimed that once he heard the shooting he just ran away.  He thought the shooting was against the Crips because they had "stomped a nigger out."  At the time of the shooting, Smart claimed he was extremely drunk; as a result, he could not remember if Gibson was also there but Gibson "probably was."

Calhoun, too, initially denied being present at the shooting.  In response to continued questioning, though, he later conceded he had been walking through the G Parkway with Smart when he heard an exchange of gunfire and ran away.  Neither he nor Smart had a gun.  Calhoun informed the officers during the interview and again at its conclusion that he was just telling them what they wanted to hear.

The prosecution's gang expert, a Sacramento police detective specializing in African-American gangs, opined that Calhoun and Smart were members of the 29th Street set of the Garden Block Crips.  He also opined that the shooting was between two rival gangs, was likely related to the assault by Mtula Payton (Big T.C. Deuce) on the Blood at the prior Saturday party, and benefitted the Garden Block Crip gang.

**B.   Procedural History**

Petitioner and co-defendant Sergio Calhoun, who were both 15 years old at the time of the offenses, were each charged with two counts of assault with a firearm and one count of  shooting at an occupied vehicle.  Petitioner and Calhoun were convicted on all counts following a jury trial.  The jury also found that the crimes were committed for the benefit of a criminal street gang pursuant to California Penal Code § 186.22(b)(1).  The jury also found that Calhoun personally discharged a firearm, but that petitioner did not.  The jury concluded that the crimes resulted in great bodily injury pursuant to California Penal Code § 12022.53.  Petitioner

4

1  was sentenced to 53 years to life in state prison – three years for shooting at an occupied vehicle,

2  plus two consecutive terms of 25 years to life for violation of § 12022.53.  The trial court stayed

3  the sentences on the assault convictions.  On direct appeal, the California Court of Appeal

4  ordered the trial court to strike one of the § 12022.53 enhancements and reduce petitioner's

5  sentence to 28 years to life.  The Court of Appeal otherwise affirmed petitioner's conviction and

6  sentence in a reasoned decision issued by the California Court of Appeal on December 19, 2006,

7  and the California Supreme Court denied review on April 11, 2007, without comment or citation.

8

9                          **II.  STANDARDS OF REVIEW**

10            Because this action was filed after April 26, 1996, the provisions of the

11  Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively

12  applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct.

13  (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA

14  does not, however, apply in all circumstances.  When it is clear that a state court has not reached

15  the merits of a petitioner's claim, because it was not raised in state court or because the court

16  denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal

17  habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir.

18  2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach

19  petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208

20  (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on

21  perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the

22  evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing

23  petition de novo where state court had issued a ruling on the merits of a related claim, but not the

24  claim alleged by petitioner).  When the state court does not reach the merits of a claim,

25  "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

26  / / /

1    Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is

2    not available for any claim decided on the merits in state court proceedings unless the state

3    court's adjudication of the claim:

4           (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established Federal law, as determined

5           by the Supreme Court of the United States; or

6           (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the State

7           court proceeding.

8    28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

9    Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).  Thus,

10   under § 2254(d), federal habeas relief is available only where the state court's decision is

11   "contrary to" or represents an "unreasonable application of" clearly established law.  Under both

12   standards, "clearly established law" means those holdings of the United States Supreme Court as

13   of the time of the relevant state court decision.  See Carey v. Musladin, 127 S.Ct. 649, 653-54

14   (2006).  "What matters are the holdings of the Supreme Court, not the holdings of lower federal

15   courts."  Plumlee v. Masto, 512 F.3d 1204 (9th Cir. Jan. 17, 2008) (en banc).  Supreme Court

16   precedent is not clearly established law, and therefore federal habeas relief is unavailable, unless

17   it "squarely addresses" an issue.  See Moses v. Payne, ___ F.3d ___ (9th Cir. Sept. 15, 2008)

18   (citing Wright v. Van Patten, 128 S.Ct. 743, 746 (2008)).  For federal law to be clearly

19   established, the Supreme Court must provide a "categorical answer" to the question before the

20   state court.  See id.; see also Carey, 127 S.Ct at 654 (holding that a state court's decision that a

21   defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an

22   unreasonable application of, the Supreme Court's test for determining prejudice created by state

23   conduct at trial because the Court had never applied the test to spectators' conduct).  Circuit

24   court precedent may not be used to fill open questions in the Supreme Court's holdings.  See

25   Carey, 127 S.Ct. at 653.

26   / / /

6

1        In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a

2   majority of the Court), the United States Supreme Court explained these different standards.  A

3   state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by

4   the Supreme Court on the same question of law, or if the state court decides the case differently

5   than the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state

6   court decision is also "contrary to" established law if it applies a rule which contradicts the

7   governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

8   that Supreme Court precedent requires a contrary outcome because the state court applied the

9   wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme

10  Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See

11  id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to

12  determine first whether it resulted in constitutional error.  See Benn v. Lambert, 293 F.3d 1040,

13  1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which

14  case federal habeas relief is warranted.  See id.  If the error was not structural, the final question

15  is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

16       State court decisions are reviewed under the far more deferential "unreasonable

17  application of" standard where it identifies the correct legal rule from Supreme Court cases, but

18  unreasonably applies the rule to the facts of a particular case.  See id.; see also Wiggins v. Smith,

19  123 S.Ct. 252 (2003).  While declining to rule on the issue, the Supreme Court in Williams,

20  suggested that federal habeas relief may be available under this standard where the state court

21  either unreasonably extends a legal principle to a new context where it should not apply, or

22  unreasonably refuses to extend that principle to a new context where it should apply.  See

23  Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

24  decision is not an "unreasonable application of" controlling law simply because it is an erroneous

25  or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 123 S.Ct.

26  1166, 1175 (2003).  An "unreasonable application of" controlling law cannot necessarily be

1   found even where the federal habeas court concludes that the state court decision is clearly

2   erroneous.  See Lockyer, 123 S.Ct. at 1175.  This is because ". . . the gloss of clear error fails to

3   give proper deference to state courts by conflating error (even clear error) with

4   unreasonableness."  Id.  As with state court decisions which are "contrary to" established federal

5   law, where a state court decision is an "unreasonable application of" controlling law, federal

6   habeas relief is nonetheless unavailable if the error was non-structural and harmless.  See Benn,

7   283 F.3d at 1052 n.6.

8          The "unreasonable application of" standard also applies where the state court

9   denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

10  848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).   Such decisions

11  are considered adjudications on the merits and are, therefore, entitled to deference under the

12  AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

13  The federal habeas court assumes that state court applied the correct law and analyzes whether

14  the state court's summary denial was based on an objectively unreasonable application of that

15  law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

16

17                        **III.  DISCUSSION**

18          Petitioner raises six interrelated claims:

19      1.      The conviction violated due process under the Fourteenth Amendment to
                the United States Constitution [because] there is no evidence that Jarvell
20              Smart committed a crime;

21      2.      The in-court identification of defendant Smart was unnecessarily
                suggestive and conducive to irreparable mistaken identification such that it
22              violated defendant's right to due process under the Fourteenth
                Amendment;
23
        3.      The jury was misinstructed on the Penal Code section 12022.53(d)
24              enhancement and this error violated defendant's rights to a jury trial, to
                proof beyond a reasonable doubt, and to due process under the Fifth,
25              Sixth, and Fourteenth Amendments;

26  / / /

                                    8

4.      The court committed prejudicial error and violated Smart's right to confrontation and due process in allowing the prosecution expert to offer his opinion that the predicate offenses had occurred;

5.      The gang allegation finding is not supported by substantial evidence and the increased punishment based on that finding violates the Due Process Clause of the Fourteenth Amendment; and

6.      The sentence of 28 years to life is cruel and unusual punishment under the federal constitution.

A.    **Sufficiency of the Evidence**

Petitioner raises three claims related to the sufficiency of the evidence.  He argues in Claim 1 that the evidence was not sufficient to establish that he committed any crime.  The California Court of Appeal addressed this claim by discussing the sufficiency of the evidence that petitioner aided and abetted Calhoun and possibly Gibson.  Petitioner contends in Claims 4 and 5 that the evidence was insufficient to establish the predicate offenses necessary for the gang enhancement because the court admitted the gang expert's opinion as the only evidence on this issue.  The state court addressed these claims by discussing petitioner's argument on direct appeal that the prosecution should have been required to prove the predicate offenses through only non-expert evidence and that expert opinion was insufficient to establish the gang enhancement.

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that, upon the record of evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979).[2]  Under Jackson,

---

[2]    Even though Jackson was decided before AEDPA's effective date, this expression of the law is valid under AEDPA's standard of federal habeas corpus review.  A state court decision denying relief in the face of a record establishing that no rational jury could have found proof of guilt beyond a reasonable doubt would be either contrary to or an unreasonable application of the law as outlined in Jackson.  Cf. Bruce v. Terhune, 376 F.3d 950, 959 (9th Cir. 2004) (denying habeas relief on sufficiency of the evidence claim under AEDPA standard of review because a rational jury could make the finding at issue).

1  the court must review the entire record when the sufficiency of the evidence is challenged on

2  habeas.  See id.  It is the province of the jury to "resolve conflicts in the testimony, to weigh the

3  evidence, and to draw reasonable inferences from basic facts to ultimate facts."  Id.  "The

4  question is not whether we are personally convinced beyond a reasonable doubt.  It is whether

5  rational jurors could reach the conclusion that these jurors reached."  Roehler v. Borg, 945 F.2d

6  303, 306 (9th Cir. 1991);  see also Herrera v. Collins, 506 U.S. 390, 401-02 (1993).  The federal

7  habeas court determines sufficiency of the evidence in the context of the substantive elements of

8  the criminal offense, as defined by state law.  See Jackson, 443 U.S. at 324 n

9           1.    Aiding and Abetting

10          As to the sufficiency of the evidence to establish that petitioner aided and abetted

11  Calhoun, and possibly Gibson, the California Court of Appeal stated:

12          "A person aids and abets the commission of a crime when he or
            she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and
13          with intent or purpose of committing, facilitating, or encouraging
            commission of the crime, (iii) by act or advice, aids, promotes,
14          encourages, or instigates the commission of the crime."  (citation omitted).
                   Substantial evidence shows that Smart, a Garden Block Crips gang
15          member, accompanied at least one armed member of his gang (Calhoun;
            possibly also Gibson) into disputed gang territory in the G Parkway,
16          knowing that his gang had previously "stomped . . . out" a rival member of
            the Meadowview Bloods gang.  A shootout between these Crips and the
17          Bloods ensued, during which the victims in the white Explorer were
            caught in the crossfire; or, the defendants simply targeted the Explorer
18          pursuant to a gang shooting.  There is substantial evidence that Smart
            moved in tandem with Calhoun during and after the shooting, that
19          Calhoun asked Smart during the incident, "[D]id you get 'em?," and that
            Calhoun and Smart had written previous letters to one another detailing
20          various gang activities and guns.  There is other, weaker evidence that
            Smart was also armed during the shootout.
21                 In light of this evidence, a rational juror could conclude that Smart
            knew that Calhoun was armed and a gang shooting was possible, that
22          Smart intended to facilitate or encourage his gang compatriots if a
            shooting occurred, and that by act or advice he promoted or encouraged
23          those compatriot(s) during the shooting.  Consequently, a rational juror
            could conclude beyond a reasonable doubt that Smart aided and abetted
24          the charged offenses. . . .

25  / / /

26  / / /

                              10

1   Petitioner argues:

2          The Court of Appeal claimed that Smart "accompanied at least one
    armed member of his gang" into disputed territory knowing that a rival
3   gang member had been recently assaulted.  But nowhere does the Court
    say that Smart knew that Calhoun was armed, or that he had any reason to
4   believe Calhoun was armed.  First, there is no evidence that Smart entered
    the G Parkway on the night in question with the intent to engage in combat
5   with the Meadowview Bloods.  Even if co-defendant Calhoun harbored
    such a purpose, and there is no evidence that he did, nothing suggests that
6   Smart knew of Calhoun's purpose.  The facts that the G Parkway was
    disputed turf, and that a Meadowview Blood had been beaten a few nights
7   earlier, are not a sufficient basis to infer that Smart was trolling for Bloods
    on the night in question, seeking to engage them in a gun battle.  Second,
8   there is no evidence that Smart knew Calhoun was carrying a weapon.
    Third, even if Smart knew that Calhoun intended to commit a crime, and
9   even if Smart intended to aid and abet Calhoun, there is no evidence that
    Smart actually did anything to aid and abet Calhoun's commission of the
10  crime.

11                      * * *

12         In light of the meager evidence produced at trial, no reasonable
    juror could have found that Smart aided and abetted the shooting.  The
13  prosecution case is built on speculation and innuendo, not evidence.  The
    convictions must be reversed.

14

15         Initially, the court notes that the Court of Appeal applied the standard of Jackson

16  v. Virginia by analyzing whether rational jurors could reach the conclusion reached in this case

17  that petitioner was an aider and abettor.  Therefore, this court reviews to determine whether the

18  state court's adjudication was an unreasonable application of Jackson.  As stated above, the

19  question is not whether the court is itself convinced that the evidence establishes petitioner's

20  guilt beyond a reasonable doubt, but whether the state court reasonably applied Jackson in

21  determining that a rational juror could so conclude.   Thus, while it is not for this court to second-

22  guess the jury as to analysis of the evidence, it is appropriate to consider whether the state court

23  reasonably concluded that a rational juror could draw the inferences actually reached by the jury

24  in this case.

25  / / /

26  / / /

11

Turning to the facts relied upon by the state court in reaching its determination, Norman stated that she saw two black males – one shorter than the other – at the time of the shooting. According to Norman, the taller individual had a gun and the shorter one did not. At some point during the course of the incident, the two males walked in front of Norman's car and the taller of the two was illuminated by the car's headlights. Norman stated that, as they walked in front of the car, the taller individual said "Did you get 'em?" Norman also stated that, after several shots had been fired but before the gunfire ended, she drove away. Norman told investigating police officers that, while she would probably be able to identify the taller individual, she would not be able to identify the shorter of the two. Later, when shown a photo line-up which included photographs of Calhoun and Smart, Norman said that the photo of Calhoun resembled the taller individual. At trial, Norman positively identified both Calhoun and Smart as the individuals she saw on the night of the incident.

Slade, a witness to the incident, saw two black men, one taller than the other, standing beside the driver's door of Norman's vehicle. Slade saw the taller individual holding a handgun in his left hand. Slade said that, as the vehicle drove off, the two men ran off. Another witness, Reno, testified he saw Calhoun, Smart, and a Blood named Jacoby James, at the apartment complex on the night of the shooting. According to Reno, James fired first, either at Norman's vehicle or at Calhoun and Smart, and that Calhoun returned fire with a handgun while Smart accompanied Calhoun. Reno also stated that Mtula Payton – who is a member of the Crips gang – had punched a Meadowview Blood at a party on the Saturday before the shooting.

Gibson, who is Calhoun's nephew, told the police that he and Calhoun were at the apartment complex the night of the incident. Gibson stated that Smart was there also. According to Gibson, Calhoun and petitioner both returned fire after being fired upon first. At trial, Gibson recanted his earlier statements to police. Petitioner admitted he was at the scene and stated he thought the shooting was directed against the Crips because they had "stomped a nigger out." Petitioner said that, after the shooting began, he ran away. Calhoun also admitted that he and

12

1    Smart were at the scene of the incident.  According to Calhoun, neither he nor Smart had guns

2    and they ran away upon hearing gunfire.

3            Given the admissions by petitioner and Calhoun, Gibson's statements to police,

4    and the various eye witness testimony that two black males – one taller than the other – were near

5    Norman's vehicle at the time of the incident, any rational juror could reasonably conclude that

6    petitioner and Calhoun were the individuals Norman and the other witnesses saw.  Based on

7    Reno's statement that Mtula Payton – a Crip – had punched  a Meadowview Blood the Saturday

8    before the incident, and petitioner's statement that he thought the shooting was directed at Crips

9    because they had "stomped a nigger out," a rational juror could infer that petitioner was referring

10   to the Saturday incident in which Payton punched a Meadowview Blood and that he knew of this

11   as a reason the Bloods would want to retaliate against the Crips.  As to the actual shooting

12   incident, based on Reno's testimony that Jacoby James – a Blood – fired the first shots, as well as

13   Gibson's statement that both Calhoun and petitioner – Crips – returned fire, a rational juror could

14   also infer that the shooting incident was in fact a shoot-out between rival gangs.  Based on the

15   same statements, a rational juror could also reject testimony from Calhoun and petitioner that

16   they did not have guns and that, after shots were first fired, they simply ran away.

17           Therefore, a rational juror could conclude that:  (1) both petitioner and Calhoun

18   were at the scene of the shooting; (2) the shooting was a shoot-out between rival street gangs

19   initiated by a Blood against Crips in retaliation for the actions of Mtula Payton the Saturday

20   before; (3) Calhoun and petitioner both had guns, (4) Calhoun returned fire after being fired upon

21   by a Blood; and  (5) petitioner knew the gunfire exchange was initiated by a Blood in retaliation

22   for the actions of Mtula Payton.  As the state court observed, these reasonable inferences could

23   lead a rational juror to conclude that "Smart, a Garden Block Crips gang member, accompanied

24   at least one armed member of his gang (Calhoun; possibly also Gibson) into disputed gang

25   territory in the G Parkway, knowing that his gang had previously 'stomped . . . out' a rival

26   member of the Meadowview Bloods gang."

1       Turning to petitioner's arguments, it does not matter for purposes of the charged

2  offenses, or aiding and abetting liability, whether petitioner knew that Calhoun was armed when

3  they entered the G Parkway, whether Calhoun entered the G Parkway intending to engage in a

4  shoot-out, or whether petitioner had the same intent.  The evidence shows that neither petitioner

5  nor Calhoun fired first.  The crimes in this case did not result from "trolling for Bloods" as

6  petitioner suggests.  Rather, the criminal conduct was returning fire and, in so doing, assaulting

7  the victims with a firearm and shooting into an occupied vehicle.  A rational juror could conclude

8  that, after being shot at by a rival gang member, Calhoun and petitioner formed the necessary

9  intent to return fire and/or aid in doing same.  A rational juror could also conclude that, as a

10 fellow Crip, petitioner would have shared the intent Calhoun formed before returning fire.  Thus,

11 the intent of petitioner and/or Calhoun upon entering the G Parkway is irrelevant.

12      Petitioner's strongest argument is that "even if Smart knew that Calhoun intended

13 to commit a crime, and even if Smart intended to aid and abet Calhoun, there is no evidence that

14 Smart actually did anything to aid and abet Calhoun's commission of the crime."  Quoting

15 People v. Brady, respondents note that the basis for aider and abettor liability in California is that

16 ". . . one renders some independent contribution to the commission of the crime or otherwise

17 makes it more probable that a crime will be successfully completed than would [be] the case

18 absent such participation."  190 Cal.App.3d 124, 132 (3rd  Dist. 1987).  Respondents argue that

19 the evidence shows that petitioner "provided back-up and support for Calhoun" and that, in so

20 doing, he was equally liable for Calhoun's conduct.  The court agrees.

21      As discussed above, Gibson stated to police that Calhoun and petitioner both

22 returned fire.  While the jury specifically found that petitioner did not personally use a firearm, a

23 rational juror could nonetheless conclude that petitioner had a gun, even though he did not use it.

24 By having a gun, a rational juror could certainly conclude that he aided and abetted Calhoun, a

25 fellow gang member, by providing back-up and support.  Despite the jury's actual conclusion

26 that petitioner did not personally use a firearm, Calhoun's statement to petitioner at the time of

1  the incident – "Did you get 'em?" – indicates that petitioner and Calhoun had the same goal and

2  were "moving in tandem," as the state court observed.  Thus, a rational juror could conclude that

3  petitioner provided encouragement to Calhoun, a fellow gang member, during the shoot-out.

4  　　　　For all these reasons, the court cannot say that the state court's adjudication

5  resulted from an unreasonable application of the Jackson standard.

6  　　　　2.　　Gang Enhancement

7  　　　　Petitioner argues in Claims 4 and 5 that evidence of the required predicate

8  offenses could not come from expert witness opinion and, because it did, the evidence was

9  insufficient to establish the predicate offenses.  The state court addressed this argument as

10  follows:

11  　　　　Smart contends the prosecution erroneously relied on the gang
expert's opinion testimony to establish the required predicate offenses for

12  the gang enhancement instead of simply proving these offenses through
proper non-expert channels (e.g., documentary evidence).  We disagree.

13  　　　　To apply the gang enhancement . . . to an aiding and abetting
defendant, that defendant must have committed the applicable offense for

14  the benefit of a criminal street gang within the meaning of section 186.22,
subdivision (b), gang enhancement.  (citation omitted).  To establish this

15  criminal street gang element, the prosecution must prove that a gang
includes members that have engaged in a "'pattern of criminal gang

16  activity,'" meaning that gang members have, individually or collectively,
committed or attempted to commit two or more specified criminal

17  offenses (the predicate offenses).  The predicate offenses themselves need
not be gang-related.  (citations omitted).

18  　　　　Here, the prosecution's gang expert testified to two predicate
offenses.  In the first, Mtula Payton, a validated member of the Garden

19  Block Crips (29th Street) gang was convicted of battery with serious
bodily injury for punching out William Smith on March 28, 2004, simply

20  because Smith was attending a Crips party and said he was from
Meadowview (but not a gang member).  In the second, Marques Payton,

21  another Garden Block Crips (29th Street) member, was convicted of
assault with a firearm for shooting Nolan Rapier, a rival G-Mob gang

22  member, on February 24, 2002, in retaliation for Rapier's confrontation
with some "little homies" of Garden Block.  The gang expert had

23  "personally investigate[d]" both of these offenses and provided a wealth of
detail regarding them.

24  　　　　Smart relies on In re Nathaniel C. (1991) 228 Cal.App.3d 990
(Nathaniel C.) and In re Leland D (1990) 223 Cal.App.3d 251 (Leland D.)

25  to claim the gang expert's testimony here was insufficient to establish the
required predicate offenses.  Smart's reliance is misplaced.

26

The evidence deemed insufficient to establish a predicate offense in *Nathaniel C.* and *Leland D.* involved police officers providing only non-specific hearsay information of suspected offenses.  In *Nathaniel C.*, the officer testified about a suspected shooting of one gang member by another in another city.  The officer had no personal knowledge of the incident and repeated only what he had been told by the police in the other city regarding what they believed about the shooting.  (citation omitted).  In *Leland D.*, the non-specific hearsay was from unidentified gang members and there was no evidence even as to when the alleged crimes had taken place.  (citation omitted).

By contrast, the gang expert here (a gang detective) had *personally investigated* both of the predicate offenses and provided a wealth of detail about them, including that they resulted in particular convictions.  This evidence more than meets the test of sufficiency. . . .

Petitioner's argument that the detective's testimony regarding the predicate offenses was inadmissible expert testimony is flawed.  While the detective was indeed the prosecution's gang expert, he also had first-hand knowledge of the predicate offenses because he had personally investigated them.  Therefore, as to the predicate offenses, the detective was not testifying as an expert.  Contrary to petitioner's assertion, the detective did not offer his opinion that the predicate offenses occurred.  Rather, he offered his first-hand knowledge that they had occurred.  In fact, because predicate offenses need not themselves be gang-related, the detective's expertise in the area of criminal street gangs was irrelevant to his testimony concerning predicate offenses.

Petitioner also suggests in Claim 4 that he was denied the right to confrontation because the only evidence of the predicate offenses came from the detective.  This argument is meritless because the record shows that petitioner had every opportunity to cross-examine the detective.

Because a rational jury could certainly conclude from the detective's testimony that the required predicate offenses had occurred, the court finds that the state court's adjudication was not the result of an unreasonable application of <u>Jackson</u>.

///

///

B.    **In-Court Identification**

Petitioner argues in Claim 2 that Norman's in-court identification was unnecessarily suggestive and, therefore, prejudicial.  As to this claim, the Court of Appeal stated:

> The defendants claim that Norman's in-court identification of them was based on unnecessarily suggestive means and should not have been admitted.  The basis of this claim is that Norman failed to identify the defendants in the pre-trial photo lineups, the trial court denied Calhoun's motion for pre-trial lineup, and then Norman first identified defendants in the incriminating context of a trial.  We disagree with this claim.
>
> In a case where there exists a reasonable likelihood of a mistaken identification, due process requires that an accused, upon timely request, be afforded a pre-trial lineup for witnesses.  (citation omitted).  The trial judge is vested with "broad discretion" in this realm, and the timeliness of such a request plays a big part in that discretion.  (citation omitted). . . .
>
> Here, the trial court found Calhoun's lineup request untimely.  Calhoun made the request five months after his arrest, three months after he was held to answer, and less than two months before the trial date.  We cannot say the trial court abused its discretion in this regard.
>
> Moreover, we agree . . . ". . . that the positive, in-court identification of a defendant by an assault victim need not be excluded merely because the victim has previously failed to make a positive identification from a photographic display. . . .  These circumstances do not amount to an impermissible unfair one-person showup."  (citation omitted). . . .  [A] victim's failure to identify a defendant from a pre-trial photo display goes to the weight of the victim's in-court identification, not its admissibility.  (citation omitted).  The same can be said here.  Here, the defense was allowed to exploit the weaknesses in Norman's in-court identification, including her experience with the pre-trial photo displays.

Respondents argue that there is no clearly established United States Supreme Court precedent regarding in-court identifications and, therefore, habeas relief is unavailable.  Respondents also argue that, even if there is clearly established law, the in-court identification was not unnecessarily suggestive.  Finally, respondents argue that any constitutional error was harmless because it could not have had a substantial and injurious effect on the jury's verdict.

Initially, the court observes that petitioner's claim regarding the in-court identification is not presented in the typical context of such claims.  Typically, defendants who are subjected to unnecessarily suggestive pre-trial lineups argue that the in-court identification is tainted as a result.  Here, however, petitioner cites to Neil v. Biggers, 409 U.S. 188 (1972), and argues that the in-court identification was itself unnecessarily suggestive because he and Calhoun

1   were isolated behind counsel table and, therefore, easily identifiable as the accused.  Essentially,

2   he equates the in-court identification to an improper one-person show-up.  First, Biggers is not

3   applicable to petitioner's argument because it only speaks to in-court identifications to the extent

4   they are tainted by improper pre-trial line-ups.  Petitioner does not argue that the photo display

5   presented to Norma was improper.  Second, under petitioner's logic all in-court identifications

6   would be impermissible.  The court declines to adopt such a rule.

7          Petitioner argues that the in-court identification was somehow infirm because

8   Norman did not have ample opportunity to see him on the night of the incident and because

9   Norman was unable to identify him in the photo line-up.  As the state court noted, however, these

10  arguments go to the weight of Norman's in-court identification and not to whether it was

11  unconstitutionally suggestive.  Petitioner had every opportunity at trial to impeach Norman's in-

12  court identification.  Nonetheless, the jury concluded that he and Calhoun were indeed the

13  individuals Norman, as well as other witnesses, saw the night of the shooting.

14         The court cannot say that the state court's determination of this claim was either

15  contrary to or an unreasonable application of any clearly established law governing petitioner's

16  claims that the in-court identification was unnecessarily suggestive.

17      **C.**      **Jury Instruction on § 12022.53(d) Enhancement**

18         In Claim 3, petitioner argues that the trial court misinstructed the jury on the

19  California Penal Code § 12022.53(d) enhancement because it did not define "proximate cause."

20  A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a transgression

21  of federal law binding on the state courts.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.

22  1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is not available for alleged

23  error in the interpretation or application of state law.  See Middleton, 768 F.2d at 1085; see also

24  Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381

25  (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de novo.  See Milton v.

26  Wainwright, 407 U.S. 371, 377 (1972).  Thus, a challenge to jury instructions does not generally

18

1   give rise to a federal constitutional claim.  See Middleton, 768 F.2d at 1085) (citing Engle v.

2   Isaac, 456 U.S. 107, 119 (1982)).

3           However, a "claim of error based upon a right not specifically guaranteed by the

4   Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

5   infects the entire trial that the resulting conviction violates the defendant's right to due process."

6   Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

7   Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  In order to raise such a

8   claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete

9   miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396

10  F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

11          In general, to warrant federal habeas relief, a challenged jury instruction "cannot

12  be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

13  process right guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317

14  (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail, petitioner

15  must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting

16  conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp,

17  414 U.S. at 147).  In making its determination, this court must evaluate an allegedly ambiguous

18  jury instruction "'in the context of the overall charge to the jury as a component of the entire trial

19  process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir.

20  1984)).  Further, in reviewing an allegedly ambiguous instruction, the court "must inquire

21  'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a

22  way' that violates the Constitution."  Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494

23  U.S. 370, 380 (1990)).  Petitioner's burden is "especially heavy" when the court fails to give an

24  instruction.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  Where an instruction is missing a

25  necessary element completely, the "reasonable likelihood" standard does not apply and the court

26  may not ". . . assume that the jurors inferred the missing element from their general experience or

19

1    from other instructions. . . ."  See Wade v. Calderon, 29 F.3d 1312, 1321 (9th Cir. 1994).  In the

2    case of an instruction which omits a necessary element, constitutional error has occurred.  See id.

3            It is well-established that the burden is on the prosecution to prove each and every

4    element of the crime charged beyond a reasonable doubt.  See In re Winship, 397 U.S. 358, 364

5    (1970).  Therefore, due process is violated by jury instructions which use mandatory

6    presumptions to relieve the prosecution's burden of proof on any element of the crime charged.

7    See Francis v. Franklin, 471 U.S. 307, 314 (1985); see also Sandstrom v. Montana, 442 U.S. 510

8    (1979).  A mandatory presumption is one that instructs the jury that it must infer the presumed

9    fact if certain predicate facts are proved.  See Francis, 471 U.S. at 314.  On the other hand, a

10   permissive presumption allows, but does not require, the trier of fact to infer an elemental fact

11   from proof of a basic fact.  See County Court of Ulster County v. Allen, 442 U.S. 140, 157

12   (1979).  The ultimate test of the constitutionality of any presumption remains constant –  the

13   instruction must not undermine the factfinder's responsibility at trial, based on evidence adduced

14   by the government, to find the ultimate facts beyond a reasonable doubt.  See id. at 156 (citing In

15   re Winship, 397 U.S. at 364).

16           Constitutional errors fall into one of two categories – trial errors or structural

17   errors.  See Brecht v. Abrahamson, 507 U.S. 619, 629 (1993).  Trial error "occur[s] during the

18   presentation of the case to the jury" and "may . . . be quantitatively assessed in the context of

19   other evidence presented in order to determine" its effect on the trial.  Arizona v. Fulminante,

20   499 U.S. 279, 307-08 (1991).  Structural errors, on the other end of the spectrum, relate to trial

21   mechanism and infect the entire trial process.  See id. at 309-10.  Even if constitutional error is

22   found, however, the error may be harmless if it is not structural.  See Hedgpeth v. Pulido, 129

23   S.Ct. 530, 532 (2008) (per curiam) (citing Chapman v. California, 386 U.S. 18 (1967)).  Denial

24   of the right to counsel is an example of a structural error.  See Brecht, 507 U.S. at 629-30 (citing

25   Gideon v. Wainwright, 372 U.S. 335 (1963)).  Improperly impeaching a defendant based on his

26   silence after receiving Miranda warnings, however, is a trial error.  See Brecht, 507 U.S. 629

1    (citing <u>Doyle v. Ohio</u>, 426 U.S. 610 (1976)).  Structural errors to which the harmless error

2    analysis does not apply are the "exception and not the rule"  <u>See</u> <u>Rose v. Clark</u>, 478 U.S. 570,

3    578 (1986).

4       In the context of jury instructions, an error is not structural so long as the error

5    does not "vitiat[e] all the jury's findings."  <u>Sullivan v. Louisiana</u>, 508 U.S. 275, 2781 (1993)

6    (holding that an erroneous reasonable doubt instruction resulted in structural error not subject to

7    harmless error analysis).  An instructional error which resulted in omission of an element of the

8    offense was a trial error subject to harmless error review.  <u>See</u> <u>Hedgpeth</u>, 129 S.Ct. at 532 (citing

9    <u>Neder v. United States</u>, 527 U.S. 1 (1999)).  An erroneous aider and abettor instruction is also not

10   structural.  <u>See</u> <u>id.</u> (citing <u>California v. Roy</u>, 519 U.S. 2 (1996) (per curiam)).  A jury instruction

11   which misstates an element of an offense is also not structural.  <u>See</u> <u>id.</u> (citing <u>Pope v. Illinois</u>,

12   481 U.S. 497 (1987)).  An erroneous burden-shifting instruction is also not structural.  <u>See</u> <u>id.</u>

13   (citing <u>Rose v. Clark</u>, 478 U.S. 570 (1986)).  Finally, an instruction on multiple theories of guilt

14   where one of the theories is improper does not result in a structural error requiring automatic

15   reversal but is error subject to harmless error analysis.  <u>See</u> <u>id.</u>

16      In <u>Chapman</u>, a case before the Supreme Court on direct review, the Court held

17   that "before a [non-structural] constitutional error can be held harmless, the court must be able to

18   declare a belief that it was harmless beyond a reasonable doubt."  386 U.S. at 24.  A different

19   harmless error standard applies to cases on collateral review.  In <u>Brecht</u>, the Court stated that

20   applying the <u>Chapman</u> standard on collateral review "undermines the States' interest in finality

21   and infringes upon their sovereignty over criminal matters."  507 U.S. at 637.  The Court also

22   noted that the <u>Chapman</u> standard is at odds with the historic meaning of habeas corpus – which is

23   meant to afford relief only to those who have been grievously wronged – because it would

24   require relief where there is only a reasonable possibility that a constitutional error contributed to

25   the verdict.  <u>See</u> <u>id.</u>  Therefore, in habeas cases, the standard applied in <u>Kotteakos v. United</u>

26   <u>States</u>, 328 U.S. 750 (1946), governs harmless error analysis for non-structural constitutional

1   errors.  See Brecht, 507 U.S. at 637.  Under this standard, relief is available where non-structural

2   error occurs only where such error "had a substantial and injurious effect or influence in

3   determining the jury's verdict."  Kotteakos, 328 U.S. at 776.

4           Under these standards, the court must determine:  (1) whether constitutional error

5   occurred; (2) if so, whether the error was structural; and (3) if not, whether the error was

6   harmless.  As to this claim, the state court agreed with petitioner and concluded that the trial

7   court misinstructed the jury:

8               Here, the trial court instructed on the proximate cause element of
                the section 12022.53(d) enhancement in terms of the group-based personal
9               infliction of great bodily injury rather than in terms of the applicable and
                approved proximate cause definition.  Consequently, the trial court erred.
10

11   Assuming that the instructional error rose to the level of a constitutional error, such error would

12   be subject to harmless error analysis because a jury instruction which misstates an element of an

13   offense is not structural.  See Pope, 481 U.S. 497.  In concluding that the instructional error in

14   this case was harmless, the Court of Appeal stated:

15               One simple answer is that the error was harmless under any
                standard of prejudice because the court instructed in terms of the
16              narrower, more difficult concept to prove of personal infliction of great
                bodily injury, rather than in terms of the broader, easier concept to show
17              of proximate causation of such injury.  (citation omitted).  The
                misinstruction, in short, benefitted the defendants.
18

19   This analysis is sound.  This court agrees that any error could not have had either a substantial or

20   injurious effect on the verdict.  Therefore, the state court's determination was neither contrary to

21   nor an unreasonable application of any clearly established law.

22       **D.    Cruel and Unusual Punishment**

23           Petitioner argues that his reduced sentence of 28 years to life constitutes cruel and

24   unusual punishment because it is "grossly disproportionate" to the severity of his crimes, citing

25   Ewing v. California, 538 U.S. 11 (2003).  In Lockyer v. Andrade, the Supreme Court concluded

26   that habeas relief was not available on a claim that two consecutive sentences of 25 years to life

1  in prison constituted cruel and unusual punishment because there is no clearly established

2  Supreme Court precedent.  538 U.S. 63, 72.  The Court stated:

3          Our cases exhibit a lack of clarity regarding what factors may
        indicate gross disproportionality. . . .  [¶] Thus . . . the only relevant clearly
4        established law amenable to the "contrary to" or "unreasonably application
        of" framework is the gross disproportionality principle, the precise
5        contours of which are unclear, applicable only in the "exceedingly rare"
        and "extreme" case.

6

7          Id. at 72-73.

8  Thus, unless the case presents the "exceedingly rare" or "extreme" situation, application of the

9  gross disproportionality principle is unclear and, for this reason, habeas relief is not available.

10          This case does not present the "exceedingly rare" or "extreme" situation to which

11  the gross disproportionality principle could be applied.  To the contrary, this court agrees with

12  the state court's conclusion that petitioner's reduced sentence does not shock the conscience.

13  Specifically, the Court of Appeal stated:

14          As for the nature of the offender, Smart and Calhoun were only 15
        years old at the time of the offenses.  Neither defendant had a lengthy
15        criminal history, but, then again, neither had a lengthy life history either:
        Smart's record consisted of battery, petty theft, and assault with a deadly
16        weapon (although the probation report indicates no weapon was actually
        used). . . .  Both defendants, however, were enmeshed in the gang culture.
17          As for the nature of the offenses, they involved a gang shooting in
        a public parking lot of a residential apartment complex.  At a minimum, in
18        a gang context, Calhoun, with Smart as back-up, fired shots from close
        range into the front seat area of a car that contained two passengers.
19        Miraculously, no one was killed, but both occupants incurred great bodily
        injury.
20          Under these circumstances, we do not find that Smart's . . . reduced
        sentence shocks the conscience. . . .
21

22  Given petitioner's young age at the time of the offenses, his criminal history – which included

23  not only the current serious felony but also assault with a deadly weapon and battery – is

24  significant.  Further, the crime was certainly serious given that it was gang-related and involved

25  shootings in a residential area at a parked car containing passengers without consideration of the

26  danger and risk of serious bodily injury or death involved.  On this record, and given the lack of

clarity from the Supreme Court as to when a term-of-years sentence with the possibility of parole constitutes cruel and unusual punishment, this court cannot say that the state court's adjudication was either contrary to or an unreasonable application of any clearly established Supreme Court precedent.

## IV. CONCLUSION

Based on the foregoing, the undersigned recommends that petitioner's petition for a writ of habeas corpus (Doc. 1) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: January 2, 2009

CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE